**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

| | | |
|---|---|---|
| PATRICK FISHER | * | |
| Plaintiff | * | |
| v. | * | Civil Case No. 8:23-cv-00225-AAQ |
| BAE SYSTEMS TECHNOLOGY | * | |
| SOLUTIONS & SERVICES INC. | * | |
| Defendant | * | |
| | * | |

**MEMORANDUM OPINION**

This is a case involving alleged violations of the Fair Labor Standards Act ("FLSA") and Maryland Wage and Hour Law ("MWHL"). Pending before the Court is Defendant BAE Systems Technology Solutions & Services Inc.'s ("BAE Systems'") Motion for Summary Judgment. ECF No. 25. The Motion has been fully briefed, and a hearing is not necessary under this Court's Local Rules. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons discussed below, Defendant's Motion for Summary Judgment shall be granted, in part, and denied, in part.

**BACKGROUND**

This action arises from Defendant BAE Systems' termination of Plaintiff Patrick Fisher's employment. Mr. Fisher began working for BAE Systems as a Service Contract Act IT contractor in or around August 2019. ECF No. 25-3, at 1; ECF No. 28, at 2. BAE Systems contracts with the federal government to provide services in three areas: identification friend or foe ("IFF") systems, exterior radio communication systems, and air traffic control systems. ECF No. 25-7, at 3. BAE Systems' IFF technology is used on military and civilian aircraft and watercraft to assist in identifying whether other aircraft or vessels are friendly. ECF No. 25-5, at 7–8. Mr. Fisher held

1

the position of Engineering Technician IV, in which he primarily worked on IFF technology aboard U.S. Navy vessels.  ECF No. 25-3, at 1; ECF No. 28, at 2-3.  His work included testing, maintenance, and repair of onboard IFF systems, as well as training the vessel's staff on the use of IFF systems.  ECF No. 25-5, at 9.  Certain IFF testing must be performed while vessels are "underway," or out at sea in navigable waters.  *See id.*

This case turns on, among other things, the proper billing practices employees such as Mr. Fisher must use when working underway.  BAE Systems paid Mr. Fisher on an hourly basis for all work he performed.  ECF No. 28-2, at 2.  According to Mr. Fisher, his first supervisor informed him that, during an underway assignment, Mr. Fisher was permitted to bill twelve hours for every twenty-four-hour day he worked: eight hours of regular time and four hours of overtime.  ECF No. 28, at 3.  This billing arrangement corresponded with the number of overtime hours that BAE Systems' client, the federal government, pre-approved before technicians left on underway assignments.  ECF No. 25-5, at 40-41, 52, 55.  Mr. Fisher testified that he accepted this system and billed according to it.  *See id.* at 52.  However, one of Mr. Fisher's subsequent supervisors, Johnny Smythe, testified that he instructed Mr. Fisher to bill for all the time that he worked, even if it exceeded the number of pre-approved hours.  *See* ECF No. 25-10, at 15.  Mr. Fisher testified that his second supervisor's instructions "sound[ed] like what [he] remember[ed]" was company policy.  ECF No. 25-5, at 72.

On three occasions during Mr. Fisher's employment with BAE Systems, Mr. Fisher worked on underway U.S. Navy ships.  *Id.* at 52.  From November 10-11, 2020, Mr. Fisher spent twenty-six hours on an underway assignment.  ECF No. 28-11, at 2.  Mr. Fisher alleges that BAE Systems did not compensate him for 8.5 hours of overtime work during this assignment.  *Id.*  On December 9, 2020, Mr. Fisher again spent a sixteen-hour period on board an underway ship performing IFF

testing.  *Id.*  Mr. Fisher alleges that BAE Systems failed to compensate him for seven hours of overtime work he performed on this assignment.  *Id.*

In April or May 2022, Mr. Fisher's direct supervisor at the time, Mr. Smythe, asked him to accept an underway assignment on the USS McCampbell, DDG-85.  *See* ECF No. 25-3, at 1; ECF No. 28, at 4.  Mr. Fisher asked Mr. Smythe whether, while on the assignment, he would continue to bill time according to the twelve-hour scheme that he had adhered to during his prior underway assignments.  ECF No. 25-5, at 52-53.  Mr. Smythe responded that he believed Mr. Fisher would continue to bill this way, but that he would confirm.  *Id.* at 53.  Mr. Smythe contacted Mr. Smith – Mr. Fisher's previous supervisor, who had recently left his position with BAE Systems – to ask about the billing structure.  *See id.* at 52-53.  Mr. Smith confirmed that Mr. Fisher should charge twelve hours per day during the assignment.  *Id.* at 53.  Based on this information, Mr. Fisher accepted the assignment.  *Id.*  Subsequently, but before Mr. Fisher left on the underway assignment, Mark Barnum, the leader of the assignment for BAE Systems, sought pre-approval from the government for Mr. Fisher's overtime hours.  *Id.*  However, a government representative responded that Mr. Fisher would have to bill less than twelve hours per day while on assignment.  *Id.*

Mr. Fisher consequently began asking questions about why the system for billing hours was changing and how BAE Systems, or its government client, was deciding how many hours to approve for assignments.  *See* ECF No. 25-6, at 56-57.  Specifically, Mr. Fisher stated in an email to Mr. Smythe; Mr. Barnum; and Jannis Van De Vijver, BAE Systems' Program Manager, that the "overtime situation with DDG 85 . . . has got [him] thinking."  *Id.* at 56; *see* ECF No. 25-3, at 5.  Mr. Fisher inquired about how "work" and "contract chargeable time" were defined for the purposes of underway assignments in BAE Systems' contract with the government, which Mr. Fisher was not permitted to read.  *See* ECF No. 25-6, at 51, 53.  BAE Systems views these questions

as part of a longer campaign by Mr. Fisher to ask questions about various aspects of his contract and terms of employment – questions which, according to BAE Systems, primarily arose out of Mr. Fisher's desire to receive an accommodation to fly business class for work travel because of his height.  *See*, *e.g.*, ECF No 25-5, at 73-77 (discussing Mr. Fisher's requests for a travel accommodation); ECF No. 25-6, at 59-73 (series of emails involving Mr. Fisher's requests for travel accommodations).

As documented in an email Mr. Fisher sent Jane Nestor, BAE Systems' IFF Portfolio Manager, in July 2022, Mr. Fisher "declined the offer" to work on the DDG-85 assignment because he was unsatisfied with the number of hours he would be permitted to bill.  ECF No. 28-8, at 2; *see* ECF No. 25-3, at 3 n.1.  According to Mr. Fisher, Michael Getty, BAE Systems' Installation and Certification Project Manager, called him into a meeting to discuss his decision.  ECF No. 28-8, at 2; *see* ECF No. 25-3, at 5; ECF No. 28, at 2.  During the meeting, Mr. Getty allegedly accused Mr. Fisher of "blackmailing the government."  ECF No. 28-8, at 2.  Mr. Fisher documented these interactions in his email to Ms. Nestor prior to a meeting scheduled between the two of them.  *Id.* In the same email, Mr. Fisher posed several questions to Ms. Nestor, which he hoped to discuss during their meeting.  *Id.* at 2-4.  His questions included: "What constitutes work while a contractor is underway?"; whether, over the past several years, contactors consistently billed the same number of hours on underway trips; and whether Ms. Nestor thought contractors should be paid for all hours while underway that they are not sleeping.  *Id.* at 3.

Ms. Nestor responded to Mr. Fisher's email, providing answers to some of his questions. *See id.* at 2-4.  Ms. Nestor wrote that "[t]here is no policy stating [contractors] are entitled to additional hours" while they are working underway, declined to answer Mr. Fisher's question about

the number of hours that contractors historically billed on underway assignments, and stated that contractors "can only get paid for work performed.  Payment for non-work is fraud." *Id.* at 3.

On August 9, 2022, Mr. Fisher sent an email to Mr. Smythe and Ms. Van De Vijver, attaching a list of questions to which he requested answers in writing.  ECF No. 28-3.  His list of questions included, in relevant part, "[w]hat is the definition of working while underway on a ship at sea?"  *Id.* at 3.  According to Mr. Smythe, Mr. Fisher had sent him the same list of questions multiple times.  ECF No. 28-16, at 7-8.  Mr. Smythe understood Mr. Fisher's questions as inquiries related to the hours Mr. Fisher worked and the overtime pay that Mr. Fisher may be entitled to.  *Id.* at 12.  Mr. Smythe also testified that he believed that Mr. Fisher raised these concerns in good faith.  *Id.* at 9.

On October 17, 2022, Richard Sexton, BAE Systems' Senior Counsel for Labor and Employment, emailed Mr. Fisher to provide answers to Mr. Fisher's questions.  ECF No. 28-9, at 4.  Mr. Sexton's email stated that "[w]e appreciate you bringing your concerns about your pay to our attention . . . ."  *Id.*  In response to Mr. Fisher's questions about work while underway, Mr. Sexton's email stated that "off-duty time while on a ship . . . is not compensable work time" under the FLSA.  *Id.*  Mr. Sexton further stated that "[t]he amount of time billed to the government is governed by their contract and is not governed by the FLSA or the [Service Contract Act]."  *Id.*

On October 29, 2022, Mr. Fisher responded to Mr. Sexton's email, sending additional questions based on Mr. Sexton's answers.  *Id.* at 2-3.  Among other questions, Mr. Fisher asked Mr. Sexton to "elaborate on what specific actions are and are not chargeable while underway," according to BAE Systems' contract with the government, including specific hypotheticals.  *Id.* at 2.  Ms. Nestor was copied on the email chain; she forwarded it to Roger Bazzarre, BAE Systems' Director of Maritime Solutions.  *Id.*; *see* ECF No. 28, at 2.  Mr. Smythe testified that he was

unaware of a response from BAE Systems' legal department addressing Mr. Fisher's follow-up inquiries.  ECF No. 28-16, at 19-20.

On November 16, 2022, BAE Systems assigned Mr. Fisher to work on the USS George Washington, CVN 73, from November 28 through December 23, 2022.  ECF No. 25-3, at 4-5.  Mr. Fisher had previously worked on the same ship from October 21 through November 11, 2022.  *Id.* at 4; ECF No. 25-5, at 20, 85.  CVN 73 was an important project for BAE Systems because the required work was behind schedule.  *See* ECF No. 25-5, at 21-23.  CVN 73 was docked in Newport News, Virginia, and was not scheduled for any underway work; thus, Mr. Fisher would not be asked to work underway as part of this assignment.  *See id.* at 10-12, 85.

When Mr. Smythe asked Mr. Fisher to support the CVN 73 assignment, Mr. Fisher verbally declined, which Mr. Fisher contends was permissible under BAE Systems' "unwritten protocol" for assigning technicians to projects.  *See id.* at 17, 43-46.  Mr. Fisher testified that typically, a project's supervisor will ask technicians if they are willing to support a particular project.  *Id.* at 44.  If a technician declines an assignment, the supervisor "go[es] down the line and . . . figure[s] out who can or will support" the project.  *Id.*  If no capable technicians initially accept the assignment, then management "bring[s] everyone together" for the technicians to discuss the assignment and decide amongst themselves who would cover the assignment.  *Id.* at 44-45.  As Mr. Fisher testified, "saying no when you've been assigned [to a project] isn't insubordination, it's not refusal, it's just the normal dialogue that happens between supervisor and tech in order to figure out who will be supporting the ship."  *Id.* at 46.  Thus, throughout his communications with BAE Systems regarding the CVN 73 assignment, Mr. Fisher believed they "were always at the asking part" of the protocol.  *Id.* at 47.

However, according to Mr. Fisher, after he initially declined to support CVN 73, the matter escalated in an unusual manner.  Mr. Getty sent Mr. Fisher an email stating: "You have verbally stated that you will not support this event.  Please reply to this email by COB 17 November 2022, confirming whether or not you will support as assigned.  A non-reply to this email will be interpreted as you refusing to support this event."  ECF No. 28-4, at 3.  On November 17 at 1:09 P.M., Mr. Fisher responded to Mr. Getty's email "respectfully request[ing] that BAE Systems provide answers to the questions that [he had] been seeking answers to for months."  *Id.* at 2.  Mr. Fisher additionally asked Mr. Getty to answer more questions about the amount of travel he had been required to do, whether other technicians were qualified to support the CVN 73 assignment, and if so, whether BAE Systems had asked others to support the assignment.  *Id.* at 3.  Mr. Getty forwarded the email exchange to Ms. Nestor, who asked Mr. Getty "not to respond to the new set of questions and reply back to [Mr. Fisher] requesting he answer 'Yes' or 'No' to supporting the [assignment]."  *Id.* at 2.  Mr. Getty sent a response to Mr. Fisher that did not acknowledge his additional questions, but only asked: "Will you support this event?  Yes or no?"  ECF No. 28-5, at 5.  Mr. Fisher responded, asking Mr. Getty to "engage in dialogue" with him and provide answers to his questions before he would tell Mr. Getty whether he agreed to support CVN 73.  *Id.* at 4-5.  Mr. Getty responded again that he would "not be answering [Mr. Fisher's] below questions," and that he "need[ed] a simple 'yes' or 'no' on if [Mr. Fisher] intend[ed] to support as assigned" before the close of business.  *Id.* at 4.  Mr. Fisher again responded that he wanted answers to his questions before giving a final answer about whether he would support CVN 73.  *Id.*

Mr. Getty forwarded the exchange to Ms. Nestor, who forwarded it to Mr. Bazzarre with the message: "After a flurry of emails between [Mr. Getty] and [Mr. Fisher] yesterday, we are moving forward with the warning letter.  If he still refuses to go to the ship, he will be terminated."

*Id.* at 3.  On November 18, 2022, BAE Systems issued Mr. Fisher a Letter of Warning, which stated that Mr. Fisher's refusal to confirm support for the CVN 73 assignment was in violation of BAE Systems' policy.  ECF No. 25-6, at 2.  The letter stated that the assignment was "not optional," and that Mr. Fisher was "being directed by management to support this assignment."  *Id.*  The letter warned Mr. Fisher that "[f]uture actions of a similar nature [would] result in further disciplinary action up to and including termination."  *Id.*

On November 21, 2022, Trina Goodell, a member of BAE Systems' human resources department, emailed Rosalind Stanson, another human resources employee, to request approval to terminate Mr. Fisher "in the event [Mr. Fisher] refuses to travel as required . . . or does not respond to the request" by a deadline.  ECF No. 28-6, at 3.  On the same day, Mr. Smythe, Ms. Van De Vijver, and Mr. Getty met with Mr. Fisher to have another discussion about the assignment.  ECF No. 25-6, at 3-4.  On November 22, 2022, BAE Systems terminated Mr. Fisher's employment.  ECF No. 28-2, at 6.

On January 27, 2023, Mr. Fisher filed his Complaint in this Court, alleging that BAE Systems violated the FLSA and MWHL.  ECF No. 1.  The parties engaged in discovery, and on February 6, 2024, BAE Systems filed a Motion for Summary Judgment.  ECF No. 25.  Mr. Fisher filed a Response in Opposition on March 4, 2024, ECF No. 28, and BAE Systems filed a Reply in Support of its Motion on March 25, 2024, ECF No. 31.

## STANDARD OF REVIEW

The Court will grant a motion for summary judgment only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If there are factual issues that "properly can be resolved only by a finder of

fact because they may reasonably be resolved in favor of either party," then the Court must deny the request for summary judgment.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).  The party moving for summary judgment bears the burden of showing that there are no genuine issues of material fact.  Fed. R. Civ. P. 56(a); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de Fr. v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the nonmoving party. *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).  "A party who bears the burden of proof on a particular claim must factually support each element of his or her claim." *Scott v. United States*, No. PJM-06-2777, 2007 WL 3020185, at *1 (D. Md. Feb. 23, 2007).  Thus, on those issues on which the nonmoving party will bear the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.  *See Anderson*, 477 U.S. at 256-57.  "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility."  *U.S. Equal Emp. Opportunity Comm'n v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 437 (D. Md. 2020) (citing *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002)).

## ANALYSIS

### I.      Mr. Fisher's Retaliation Claims

Mr. Fisher advances claims against Defendant for retaliatory discharge under both the Maryland Wage and Hour Law ("MWHL") and the Fair Labor Standards Act ("FLSA"). Defendant argues that it is entitled to summary judgment on each claim.  The Court addresses each claim below.

### A.  MWHL

Mr. Fisher advances a retaliation claim against Defendant pursuant to the MWHL, which provides in relevant part that "employees cannot be fired in retaliation for complaining about unfair wage practices." *Cellitto v. Semfed Mgmt., Inc.*, No. RDB-06-1794, 2007 WL 1725442, at *5 (D. Md. June 12, 2007) (citing Md. Code Ann., Lab. & Empl. § 3-428, *amended by* H.B. 136, 2024 Leg., 446th Sess. (Md. 2024)).[1]  At the time Mr. Fisher filed the present lawsuit, the MWHL did not provide for a "private cause of action for employees against their employers if they [were] discharged for complaining about unlawful wage practices."  *Id.* (emphasis omitted).  Rather, the MWHL provided solely a criminal penalty for retaliatory discharge.  *See id.* (citing Md. Code Ann., Lab. & Empl. § 3-428, *amended by* H.B. 136, 2024 Leg., 446th Sess. (Md. 2024)); *see also Randolph v. ADT Sec. Servs., Inc.*, 701 F. Supp. 2d 740, 747 (D. Md. 2010) (noting, in the context of deciding whether plaintiffs could assert a common law abusive discharge claim, that the MWHL "only provide[d] a criminal penalty for violation [of] the anti-retaliatory provision," not a civil remedy).[2]

---

[1] As of July 1, 2024, section 3-105 of the Labor and Employment Article of the Maryland Code prohibits an employer from retaliating against an employee for complaining about unfair wage practices.  *See* Md. Code Ann., Lab. & Empl. § 3-105(a)(3), (b).

[2] Per the Maryland legislature's amendment of the Labor and Employment Article, as of July 1, 2024, an employee has a private cause of action against an employer for retaliation under the MWHL, but only after exhausting administrative remedies.  *See* Md. Code Ann., Lab. & Empl. § 3-105(a)(3), (b)(1), (d)-(e).

Mr. Fisher's Response in Opposition to Defendant's Motion does not address this issue. *See* ECF No. 28, at 24.  By failing to respond to this argument, Mr. Fisher "concedes the point." *Stenlund v. Marriott Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016).  Accordingly, Mr. Fisher's MWHL retaliation claim fails as a matter of law.

### B.   FLSA

Mr. Fisher also advances a retaliation claim under the FLSA, which provides, in relevant part, that it is unlawful for a covered employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter."  29 U.S.C. § 215(a)(3).  The anti-retaliatory provision "effectuates enforcement of the Act's substantive provisions by removing 'fear of economic retaliation' so that employees need not 'quietly . . . accept substandard conditions.'"  *Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008) (omission in original) (quoting *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)).

A *prima facie* claim of retaliation under the FLSA requires a plaintiff to "show that (1) [they] engaged in an activity protected by the FLSA; (2) [they] suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action."  *Id.*  "The framework for proving retaliation under the FLSA is the same *McDonnell Douglas* scheme as is used in Title VII cases."  *Mould v. NJG Food Serv. Inc.*, 37 F. Supp. 3d 762, 778 (D. Md. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Under this burden-shifting framework, "once a plaintiff has stated a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action."  *Id.* at 779 (citing *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 458 (4th Cir. 2002)).  If the defendant makes such an articulation,

the burden returns to the plaintiff "to show that the proffered reason was not the employer's true reason but, rather, was merely a pretext for unlawful retaliation." *Id.* (citing *Anderson*, 281 F.3d at 458).

Defendant argues that it is entitled to summary judgment on Mr. Fisher's FLSA retaliation claim. First, Defendant argues that Mr. Fisher has failed to establish a *prima facie* case of retaliation because (1) he has not demonstrated that he engaged in a protected activity under the FLSA, and (2) he has not demonstrated that his activities were the but-for cause of his termination. *See* ECF No. 25-2, at 5-8, 10-12. Second, Defendant asserts a non-retaliatory reason for terminating Mr. Fisher's employment and argues that Mr. Fisher has not established that its reason is merely pretext for retaliation. *See id.* at 8-12. The Court addresses each argument below. Because Defendant's causation and pretext arguments are closely related, the Court addresses them together, as Defendant does in its briefing. *See id.* at 10-12.

### 1. Protected Activity

Defendant first argues that Mr. Fisher did not engage in an activity protected under the FLSA. *Id.* at 5. Mr. Fisher contends that he engaged in a protected activity when he sent emails to his manager and BAE Systems' senior legal counsel inquiring about certain aspects of his employment, including payment for work while underway on an assignment. *See* ECF No. 28, at 16-18.

As noted, when an employee makes a complaint "under or related to" the FLSA's substantive provisions, the Act's anti-retaliation provision makes it unlawful for an employer to discharge or otherwise discriminate against the employee for making such a complaint. 29 U.S.C. § 215(a)(3). A "complaint," for purposes of the anti-retaliation provision, "may be oral as well as written," *Yearick v. Kimball Constr. Co.*, No. ELH-23-2540, 2023 WL 8829243, at *5 (D. Md. Dec.

21, 2023) (citing *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 17 (2011)), and includes "'intracompany complaints' – that is, complaints made by an employee to an employer," *id.* (quoting *Minor v. Bostwick Lab'ys, Inc.*, 669 F.3d 428, 439 (4th Cir. 2012)).  Not "every instance of an employee 'letting off steam' to his employer constitutes protected activity."  *Minor*, 669 F.3d at 439 (quoting *Kasten*, 563 U.S. at 14).  Rather, "'some degree of formality' is required for an employee complaint to constitute protected activity," *id.* (quoting *Kasten*, 563 U.S. at 14), such that the employer is "given fair notice that a grievance has been lodged and does, or should, reasonably understand that matter as part of its business concerns," *id.* (quoting *Kasten*, 563 U.S. at 14).  Under the governing standard, which the United States Supreme Court articulated in *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011), the FLSA protects an intracompany complaint if it is "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."  *Minor*, 669 F.3d at 439 (quoting *Kasten*, 563 U.S. at 14).

Viewing all evidence in the light most favorable to Mr. Fisher, and drawing all reasonable inferences in his favor, material questions of fact remain regarding Mr. Fisher's engagement in a protected activity.  The list of questions he sent his supervisors included requests for the definition of "working" while underway, as well as inquiries about Service Contract Act ("SCA") wage determinations.  ECF No. 28-3, at 3.  BAE Systems' Senior Counsel for Labor and Employment, Mr. Sexton, provided answers to some of Mr. Fisher's questions and stated that "[w]e appreciate you bringing your concerns about your pay to our attention."  ECF No. 28-9, at 4.  Mr. Sexton answered Mr. Fisher's questions in part by writing: "In regard to your questions regarding off-duty time while on a ship, under the Fair Labor Standards Act ('FLSA'), this time is not compensable work time."  *Id.*  Mr. Sexton also wrote that "[t]he amount of time billed to the government is

governed by their contract and is not governed by the FLSA or the SCA." *Id.*  When Mr. Fisher

responded to Mr. Sexton, he asked several follow-up questions.  *Id.* at 2-3.  One such follow-up

request, which Mr. Fisher raised directly in response to Mr. Sexton's statement that off-duty time

was not compensable under the FLSA, was for Mr. Sexton to "elaborate on what specific actions

are and are not chargeable while underway, as per the governing contract."  *Id.* at 2.  Mr. Fisher

also raised other concerns about payment to BAE Systems management personnel.  In one email,

Mr. Fisher described a conversation in which he told Mr. Smythe that he "didn't think it was right

to pay a ship rider less than 12 hours for 24 hours spent onboard a ship while underway."  ECF No

28-8, at 2.  He also stated in an email that "it makes sense to pay a contractor 16 hours for each 24

hours underway" to compensate the contractor for all the time on a ship during which the contractor

is not sleeping.  *Id.* at 3.

Defendant contends that Mr. Fisher's comments and inquiries were not sufficiently formal

to constitute protected activity under the FLSA because they were questions, rather than

complaints.  *See* ECF No. 25-2, at 7-8.  The argument conflicts with the law and the facts of the

case.  First, the United States Supreme Court has stated that the enforcement needs of the FLSA

"argue for an interpretation of the word 'complaint' that would provide 'broad rather than narrow

protection to the employee.'"  *Kasten*, 563 U.S. at 13 (quoting *NLRB v. Scrivener*, 405 U.S. 117,

122 (1972)).  Accordingly, this Court has found that an employee's request to have a discussion

about pay and commission was sufficient to constitute a "complaint" for the FLSA's purposes.

*See Simons v. Mi-Kee-Tro Metal Mfg., Inc.*, No. PJM 18-1270, 2019 WL 4143005, at *4 (D. Md.

Aug. 30, 2019) (accepting that the plaintiff made a complaint where the plaintiff sent an email to

his company's president "explaining that he had been working long hours and wanted to 'discuss'

'more pay and possible Commissions on Sales'" (quoting Exhibit G at 1, *Simons*, No. PJM 18-

14

1270, ECF No. 25-8)).  Similarly, other courts have held that an employee's questions related to their pay can constitute a "complaint" for purposes of an FLSA retaliation claim.  *See DeWalt v. Greencroft Goshen, Inc.*, 902 F. Supp. 2d 1127, 1140 (N.D. Ind. 2012) (holding that the plaintiff's "questions about her status . . . constituted a valid oral complaint" because her "inquiries clearly indicated [her] concern about misclassification").  Second, while Mr. Fisher did not explicitly mention the FLSA or state that he was invoking rights under the FLSA, a plaintiff "need not have 'invoke[d] the statute by name or "employ[ed] any magic words."'"  *Bouchard v. Summit Ridge Energy, LLC*, No. 1:23cv1573, 2024 WL 1468337, at *3 (E.D. Va. Apr. 3, 2024) (alterations in original) (quoting *Reardon v. Herring*, 191 F. Supp. 3d 529, 550 (E.D. Va. 2016)); *see also Haynes v. S. Carolina Waste LLC*, 633 F. Supp. 3d 769, 787 (D.S.C. 2022) (holding that the plaintiff "did not need to specify [that] he sought correct overtime pay under the FLSA so long as his request sufficiently put [his employer] on notice"); *Dalton v. Omnicare, Inc.*, 138 F. Supp. 3d 709, 722 (N.D. W. Va. 2015) (finding that the plaintiff's complaints, which did not explicitly invoke the FLSA, "were sufficiently clear to put a reasonable employer on notice that she was invoking the protection of the FLSA").  Finally, BAE Systems' management appears to have understood Mr. Fisher to be raising concerns that involved his rights under the FLSA.  BAE Systems' labor and employment counsel referenced the FLSA in his response to Mr. Fisher's questions and understood Mr. Fisher's questions as "concerns about . . . pay."  ECF No. 28-9, at 4.  Similarly, Mr. Fisher's supervisor testified that, during these communications, he understood that Mr. Fisher was asking whether he was entitled to overtime compensation.  ECF No. 28-16, at 12.  The Court cannot conclude, as a matter of law, that Mr. Fisher's email could not lead a reasonable employer to understand it as an assertion of rights protected by the FLSA when Mr. Fisher's employer did, in fact, understand Mr. Fisher's concerns as an assertion of rights protected by the FLSA.  *See, e.g.*,

*Yearick*, 2023 WL 8829243, at *7 ("Moreover, [the employer's] alleged response – 'yeah, you weren't working' – suggests that she understood [the plaintiff] to have asserted an entitlement to pay." (quoting Amended Complaint ¶ 26, *Yearick*, No. ELH-23-2540, ECF No. 9)).

Defendant also argues that Mr. Fisher's expressions of concern were not protected activity because his concerns referenced contractual rights rather than FLSA-protected rights.  ECF No. 25-2, at 6; ECF No. 31, at 8-9.  Where a plaintiff's complaint merely asserts contractual rights, rather than rights protected by the FLSA, the plaintiff has not engaged in protected activity.  *See Hardison v. Healthcare Training Sols., LLC*, No. PWG-15-3287, 2016 WL 4376725, at *4 (D. Md. Aug. 17, 2016) (explaining that it was "unclear whether [the plaintiff] asserted that Defendants failed to pay her minimum wages, an assertion that would invoke FLSA protection, or that they simply failed to pay her correctly, which only would be an assertion of contractual rights").  However, in this case, Mr. Fisher's inquiries implicated more than just his contractual rights.  Mr. Fisher's inquiries about what work was compensable while underway related directly to whether Mr. Fisher could be eligible for overtime pay, which Mr. Fisher's supervisor and BAE Systems' legal counsel understood.  Further, not all of Mr. Fisher's communications and questions about overtime payment explicitly referred to his contract, as Defendant argues.  *See* ECF No. 25-6, at 56-57 (email from Mr. Fisher asking about "[t]his overtime situation" and "strongly disagree[ing]" with any policy providing that time "when a contractor is not physically working on equipment or providing training" is not considered "working").  Accordingly, Mr. Fisher has presented sufficient evidence to create a genuine issue of material fact as to whether BAE Systems was on "fair notice" that Mr. Fisher's inquiries amounted to an FLSA complaint.

### 2.   Pretext and Causation

Alternatively, Defendant offers evidence that it terminated Mr. Fisher for his refusal to support the CVN 73 assignment, not in retaliation for Mr. Fisher's questions regarding compensable time on underway assignments. *See* ECF No. 25-2, at 8-10. Defendant contends that Mr. Fisher's refusal to support the assignment was an intervening cause that precludes Mr. Fisher from satisfying the causation element of his retaliation claim. *See id.* at 10. Mr. Fisher responds that Defendant's proffered explanation is pretextual and that Defendant "contrived a terminal confrontation" to justify ending Mr. Fisher's employment. ECF No. 28, at 19.

In order for a plaintiff to ultimately prevail under the *McDonnell Douglas* burden-shifting framework, they must prove "both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (alterations in original) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)). Accordingly, to survive a motion for summary judgment challenging a retaliation claim, the plaintiff must both "raise a jury question about the veracity of the employer's proffered justification . . . [and] have developed some evidence on which a juror could reasonably base a finding that [retaliation] motivated the challenged employment action." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 249 (4th Cir. 2000) (quoting *Vaughan v. The MetraHealth Cos.*, 145 F.3d 197, 202 (4th Cir. 1998)). The plaintiff must either show that the employer's proffered "reason is 'unworthy of credence' or offer other forms of circumstantial evidence demonstrating retaliation." *Perry v. Peters*, 341 F. App'x 856, 858 (4th Cir. 2009) (per curiam)[3] (quoting *Price*

---

[3] In *Perry v. Peters*, 341 F. App'x 856 (4th Cir. 2009) (per curiam), the plaintiff brought their retaliation claim under Title VII rather than the FLSA, *id.* at 858, but "claims arising under the anti-retaliation provision of the FLSA are governed by the same analytical framework as those claims for Title VII retaliation," *Lee v. Safeway, Inc.*, No. RDB-13-3476, 2016 WL 3551828, at *3 (D. Md. June 30, 2016) (internal citation omitted) (citing *Mould*, 37 F. Supp. 3d at 778); *see also Darveau*, 515 F.3d at 342 (recognizing that, outside of the areas in which Title VII and the FLSA

*v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)).  A plaintiff can show that the employer's explanation is unworthy of credence by highlighting "[w]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions."  *Stennis v. Bowie State Univ.*, No. PX 16-cv-1362, 2019 WL 1507777, at *10 (D. Md. Apr. 5, 2019) (quoting *Fordyce v. Prince George's County*, 43 F. Supp. 3d 537, 550 (D. Md. 2014)).  "Moreover, close temporal proximity between a plaintiff's protected activity and the adverse action taken against [them], and failure to abide by regular procedures, are probative of pretext."  *Id.* (citing *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295-99 (4th Cir. 2010); *Basil v. Md. Transp. Auth.*, No. RDB-12-0556, 2014 WL 1622321, at *7 (D. Md. Apr. 23, 2014)).

Viewing all evidence in the light most favorable to Mr. Fisher, Mr. Fisher has presented sufficient evidence based on which a reasonable fact finder could conclude that Defendant's proffered reason for terminating Mr. Fisher was pretextual.  Specifically, Mr. Fisher has presented evidence that in terminating him, BAE Systems employed procedures which deviated from its regular processes for handling an employee's declination to support an assignment.  First, before terminating Mr. Fisher, BAE Systems personnel sought preapproval to terminate Mr. Fisher in the event that he failed to respond to, or declined, their request for him to support the CVN 73 assignment.  ECF No. 28-6, at 3.  Ms. Goodell testified that she had never before sought preapproval to terminate an employee in advance of them engaging in a terminable act.  *See* ECF No. 28-14, at 8.[4]  Second, Mr. Fisher testified that BAE Systems typically allows technicians to

---

differ in language, the Fourth Circuit "and other courts have looked to Title VII cases in interpreting the FLSA").

[4] Defendant emphasizes that Mr. Fisher had already refused to support CVN 73 several times before Ms. Goodell sought approval to terminate Mr. Fisher.  *See* ECF No. 31, at 6.  Given that there remains a question of fact regarding whether BAE Systems permitted technicians to initially

initially decline an assignment, pending a "step two" when BAE Systems management looks for other technicians who are qualified and willing to support the assignment before mandating a technician to support a project.  *See* ECF No. 25-5, at 17, 43-46.  Mr. Fisher's testimony evidences that, in this case, BAE Systems skipped "step two" of their procedure and immediately mandated that Mr. Fisher support the assignment.  *See id.* at 46-47.  Mr. Fisher testified that he had never seen BAE Systems immediately mandate that a technician support an assignment.  *Id.* at 47. Finally, Mr. Fisher's direct supervisor testified that no other employees had been terminated for declining to accept an assignment.  ECF No. 25-10, at 17.  While Defendant argues that no other technicians had refused direct assignments, ECF No. 31, at 5, there is evidence that other employees had declined the same assignment without consequence, *see* ECF No. 25-6, at 40 (email from Mr. Fisher, in which he states that "BAE Systems' employee Barton Dobers has recently refused to support CVN 73 and . . . he has not received a written warning").  Accordingly, Mr. Fisher has raised a question of material fact as to whether Defendant's proffered reason was pretextual.

Defendant's argument that Mr. Fisher cannot establish causation supporting his retaliation claim similarly relies on Mr. Fisher's refusal to support CVN 73 being the true reason for his termination.  *See* ECF No. 25-2, at 12 (arguing that Mr. Fisher cannot establish causation because the true cause of his termination was his refusal to support CVN 73); ECF No. 31, at 7 (explaining that Mr. Fisher's refusal to support CVN 73 is an intervening cause that precludes him from establishing a causal link between his questions and termination).  As explained above, Mr. Fisher has created a genuine dispute of material fact as to whether Defendant's proffered reason is

---

decline assignments, a jury could reasonably conclude that Ms. Goodell's actions were not in accordance with BAE Systems' typical procedures.

pretextual.  As such, there is not an intervening cause that, as a matter of law, precludes Mr. Fisher from establishing causation through other means, such as temporal proximity.

The Court finds that Mr. Fisher has presented sufficient evidence from which a reasonable jury could find that BAE Systems terminated his employment in retaliation for his engagement in a protected activity.  Defendant's Motion for Summary Judgment is accordingly denied as to Mr. Fisher's FLSA retaliation claim.

## II.     Mr. Fisher's Unpaid Overtime Wages Claims

Mr. Fisher advances claims under the FLSA and MWHL for unpaid overtime wages arising out of his underway assignments.  The FLSA provides that, subject to certain exceptions, employees are entitled to pay for hours they work in excess of forty hours per week "at a rate not less than one and one-half times the regular rate at which [they are] employed."  29 U.S.C. § 207(a)(1).  Similarly, the MWHL provides that "each employer shall pay an overtime wage of at least 1.5 times the usual hourly wage, computed in accordance with [section] 3-420 of this subtitle." Md. Code Ann., Lab. & Empl. § 3-415(a).  Section 3-420 provides that, subject to certain exceptions, overtime pay is appropriate for time an employee works in excess of forty hours per week. *Id.* § 3-420(a).

Defendant advances three arguments in support of its Motion for Summary Judgment as to Mr. Fisher's overtime claims.  First, Defendant argues that the statute of limitations bars Mr. Fisher's FLSA overtime claim.  ECF No. 25-2, at 13.  Second, Defendant argues that Mr. Fisher is not entitled to any overtime payment for his time working on underway ships because such assignments are subject to the seaman's exemption.  *See id.* at 16-18.  Finally, Defendant argues that even if Mr. Fisher were eligible for overtime payment for this work, his overtime claim fails because he has not identified any compensable work time for which BAE Systems did not pay

him.  *Id.* at 18.  The Court addresses each argument in the order Defendant presents them.  As discussed below, Mr. Fisher's FLSA overtime claim is barred by the statute of limitations and, while the seaman's exemption does not bar his MWHL claim, he has failed to identify compensable work time for which he is entitled to overtime payment.

### A.  FLSA Overtime Claims

The FLSA has a statute of limitations for unpaid overtime claims of "two years, unless there is a 'willful violation,' which extends the limitations window to three years."[5]  *Ramirez v. 316 Charles, LLC*, No. SAG-19-03252, 2020 WL 7398807, at *8 (D. Md. Dec. 17, 2020) (quoting 29 U.S.C. § 255(a)).  Mr. Fisher seeks unpaid overtime for work he performed on underway assignments in November and December 2020.  *See* ECF No. 28, at 3-4.  Mr. Fisher filed his complaint in January 2023, more than two years after he did the work for which he claims he is entitled to overtime pay.  *See* ECF No. 1.  Thus, Mr. Fisher's overtime claims under the FLSA are time-barred unless BAE Systems willfully violated the FLSA.

An employer's violation of the FLSA is willful if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]."  *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 130 (4th Cir. 2015) (alteration in original) (quoting *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 358 (4th Cir. 2011)).  "An employer recklessly disregards the Act's requirements 'if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry.'"  *Sanchez Carrera v. EMD Sales, Inc.*, 402 F. Supp. 3d 128, 151 (D. Md. 2019) (quoting 29 C.F.R. § 578.3(c)(3)).  However, a "'good faith but incorrect assumption that a pay

---

[5] The MWHL's statute of limitations is three years regardless of whether the violation is willful. Md. Code Ann., Cts. & Jud. Proc. § 5-101.

plan complied with the FLSA in all respects' is not a willful violation." *Id.* (quoting *Mould*, 37 F. Supp. 3d at 772). The determination of an employer's willfulness "is generally a question of fact," *Calderon*, 809 F.3d at 130 (citing *Martin v. Deiriggi*, 985 F.2d 129, 136 (4th Cir. 1993), the burden of which "rests with the employee," *id.* (citing *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 375 (4th Cir. 2011)). Thus, to survive a motion for summary judgment, a plaintiff must present evidence that raises a genuine issue of material fact concerning the employer's willfulness. *See, e.g.*, *Wilburn v. Topgolf Int'l, Inc.*, 461 F. Supp. 3d 320, 333-34 (E.D. Va. 2020), *vacated in part on other grounds*, *Wilburn v. Topgolf Int'l, Inc.*, No. 1:19-cv-493, 2020 WL 6937773 (E.D. Va. July 21, 2020); *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 617 (E.D. Va. 2014) ("Although this is ultimately a question of fact, a plaintiff must present sufficient evidence of willfulness to survive summary judgment.").

Mr. Fisher has not presented sufficient evidence from which a reasonable jury could find that BAE Systems willfully violated the FLSA. In support of his position, Mr. Fisher relies exclusively on an email he received in which Mr. Sexton stated that Mr. Fisher's off-duty time on underway ships was not compensable under the FLSA. *See* ECF No. 28, at 25. Mr. Fisher contends that because Defendant concedes that it "has not found any decision squarely addressing the application of the [seaman's] exemption to a contractor onboard a U.S. Navy aircraft carrier," Mr. Sexton recklessly recklessly disregarded the FLSA's requirements. *Id.* (quoting ECF No. 25-2, at 17). At most, this shows uncertainty regarding a legal issue, which is insufficient to constitute willfulness. *See, e.g.*, *Koelker v. Mayor of Cumberland*, 599 F. Supp. 2d 624, 632 n.8 (D. Md. 2009) (stating that "the difficulty of the issues" involved in the case supported a finding that the employer did not act willfully); *Perez*, 650 F.3d at 375 (finding that violations were not willful where "there was no binding authority directly addressing" the relevant FLSA issue); *Calderon*,

809 F.3d at 130-31 (finding "that there was no basis upon which a reasonable factfinder could conclude" the defendant's conduct was willful where the legal issue involved "was a close and complex one").

Mr. Fisher's argument is similar to that of the plaintiff in *Williams v. Maryland Office Relocators*, 485 F. Supp. 2d 616 (D. Md. 2007), *superseded on other grounds by statute*, Act of Apr. 13, 2010, ch. 100, 2010 Md. Laws 995 (codified as amended at Md. Code Ann., Lab. & Empl. § 3-501), in which the plaintiff argued that the defendant acted willfully because it described the relevant FLSA exemption as "confusing and difficult to apply." *Id.* at 621.  This Court held that the plaintiff had not established willfulness, explaining that "[t]he mere fact that defendant has contended during the course of this litigation that the . . . exemption is complex does not demonstrate that at the time it decided not to pay overtime compensation to plaintiff it was acting with knowledge or reckless disregard that it was violating the FLSA." *Id.*  "Proof of willfulness must be far stronger, such as evidence that the defendant had previously been investigated for FLSA violations, or evidence of a scheme by the employer to cover-up FLSA violations." *Id.*; *see also Hoffman v. First Student, Inc.*, No. AMD 06-1882, 2009 WL 1783536, at *7 (D. Md. June 23, 2009) (finding that the fact that previous Department of Labor investigations of the employer resulted in the employer being cited for violations and ordered to pay overtime wages precluded the entry of summary judgment on the issue of willfulness).  Evidence that an employer was involved in prior lawsuits concerning the same conduct can also support a finding of willfulness. *See Johnson v. Helion Techs., Inc.*, No. DKC 18-3276, 2021 WL 3856239, at *4-5 (D. Md. Aug. 27, 2021) (denying defendant employer's motion for summary judgment on the statute of limitations issue because it had previously been sued for FLSA violations, which provided "at least some evidence that the purported violation was done willfully").

Here, there is no evidence that BAE Systems was on notice of any FLSA violation, such as through previous investigations, citations, or litigation.  Nor is there any evidence of a scheme to hide violations.  Rather, BAE Systems consulted with an attorney about its compliance with the relevant laws, which weighs against finding that an employer willfully violated the FLSA.  *See, e.g.*, *Quirk v. Baltimore County*, 895 F. Supp. 773, 788-89 (D. Md. 1995) (explaining that county's consultation of legal counsel supported a finding that county did not act willfully).  Further, BAE Systems had no reason to believe it was failing to compensate Mr. Fisher for any hours Mr. Fisher worked while underway.  Mr. Fisher's supervisors instructed him to record all the time he worked on underway assignments, even if it exceeded the amount of overtime that the client pre-approved. *See* ECF No. 28-16, at 17; ECF No. 25-6, at 53-54.  Nonetheless, Mr. Fisher recorded no more than twelve hours, certifying in writing that this number was an "accurate" recording of the hours he worked.  ECF No. 25-5, at 104; ECF No. 25-6, at 99-100.  Accordingly, BAE Systems' conduct falls short of the circumstances under which courts have held that employers willfully violated the FLSA.  *See Randolph v. PowerComm Constr., Inc.*, 309 F.R.D. 349, 364 (D. Md. 2015) (collecting cases).  As such, the two-year statute of limitations applies, and BAE Systems' Motion for Summary Judgment is granted as to Mr. Fisher's overtime claims under the FLSA.

### B.  MWHL Overtime Claims

With respect to Mr. Fisher's claims for unpaid overtime under the MWHL, Defendant first argues that the FLSA's seaman's exemption bars the claims.  ECF No. 25-2, at 16 & n.5.  As noted, the MWHL requires that employers pay overtime rates of one and one-half times an employee's hourly rate for hours the employee works in excess of forty hours per week.  Md. Code Ann., Lab. & Empl. §§ 3-415(a), -420(a).  The FLSA, the federal statute which the MWHL largely mirrors, excludes several "classes of employees from its overtime pay requirements, including 'any

employee employed as a seaman.'" *McMahan v. Adept Process Servs., Inc.*, 786 F. Supp. 2d 1128, 1135 (E.D. Va. 2011) (quoting 29 U.S.C. § 213(b)(6)).  Defendant contends that although this exemption is not found in the text of the MWHL, it should be extended to this statute, as well.  *See* ECF No. 25-2, at 16 & n.5.  Alternatively, Defendant argues that Plaintiff has failed to create a genuine issue of material fact as to any compensable time for which Defendant failed to pay him. *See id.* at 18-20.

### 1. Applicability of the Seaman's Exemption to MWHL Overtime Claims

As this Court has recognized, the MWHL is "the state's equivalent of the FLSA." *Watkins v. Brown*, 173 F. Supp. 2d 409, 416 (D. Md. 2001).  The MWHL includes several provisions that mirror those of the FLSA, including an overtime provision, Md. Code Ann., Lab. & Empl. § 3-415(a), and exemptions thereto, *id.* §§ 3-403, -415(b)-(c).  The statutes, however, are not identical. While the MWHL includes some of the same exemptions that appear in the FLSA, *see, e.g.*, *Peters v. Int'l Brotherhood of Elec. Workers, Loc. Union No. 1200*, No. DKC 17-0134, 2017 WL 4467491, at *3 (D. Md. Oct. 6, 2017) (discussing the "administrative exemption," which appears in both the FLSA and MWHL); *Depew v. Mobile Dredging & Pumping Co.*, No. 15-03080-JMC, 2017 WL 1382307, at *10 & n.16 (D. Md. Apr. 18, 2017) (discussing the FLSA's Motor Carrier Act exemption, to which the MWHL has an equivalent), it notably does not include the seaman's exemption, *see* Md. Code Ann., Lab. & Empl. §§ 3-403, -415(b)-(c).  Defendant argues that the FLSA's seaman's exemption nonetheless applies to Mr. Fisher's overtime claims under the MWHL because the MWHL is preempted to the extent that it conflicts with the FLSA on this matter.[6]  ECF No. 25-2, at 16 n.5.

---

[6] Defendant also highlights, in arguing that the FLSA exemption should apply to Mr. Fisher's MWHL claim, that although part of Mr. Fisher's work occurred in Maryland, "none of the

Federal preemption of state law occurs under three circumstances: first, where Congress explicitly preempts state law; second, where the state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" ("field preemption"); and third, "state law is pre-empted to the extent that it actually conflicts with federal law" ("conflict preemption"). *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).

The FLSA typically does not preempt state labor laws that are more protective of employees. The FLSA "contains a 'savings clause', 29 U.S.C. § 218(a), that permits states or municipalities to enact laws that provide additional protections for employees beyond the minimum requirements established by [the] FLSA." *Butler v. DirectSat USA, LLC*, 800 F. Supp. 2d 662, 671 (D. Md. 2011). The FLSA's savings clause specifically permits states to establish higher minimum wages and lower maximum workweeks. 29 U.S.C. § 218(a). Thus, typically, when courts consider differences between the exemptions in the FLSA and exemptions in state labor laws, if the state law's exemption is narrower than the FLSA's exemption, the state law is not preempted. *See, e.g.*, *Hayward v. IBI Armored Servs., Inc.*, 954 F.3d 573, 575-76, 575 n.2 (2d Cir. 2020) (per curiam) (vacating the district court's finding that the FLSA preempted overtime claims under the New York Labor Law, which did not contain the same motor carrier exemption that is included in the FLSA, explaining that Second Circuit "precedent makes clear that the FLSA does not preempt state regulation of overtime wages," *id.* at 575 n.2); *In re Daley Farm of Lewiston*, 816 N.W.2d 671, 674 (Minn. Ct. App. 2012) (finding that the FLSA, which exempts agricultural workers, did not preempt the application of a narrower exemption in the Minnesota

underway work occurred [there]." ECF No. 25-2, at 16 n.5. The MWHL is applicable in cases "in which an employee worked in both Maryland and another state, even when the majority of the work occurred out-of-state." *Poudel v. Mid Atl. Pros., Inc.*, No. TDC-21-1124, 2022 WL 345515, at *3 (D. Md. Feb. 4, 2022).

26

Fair Labor Standards Act ("MFLSA") because the MFLSA provided a "higher standard" than the FLSA, "requiring overtime compensation for all but high-salaried agricultural workers"); *Bayada Nurses, Inc. v. Commonwealth, Dep't of Lab. & Indus.*, 8 A.3d 866, 882-83 (Pa. 2010) (finding that Pennsylvania's domestic services exemption, which is more limited than the comparable exemption under the FLSA, was not preempted because it is more protective of a worker's right to a minimum wage and overtime than the FLSA); *Lagrimas v. Gossel*, No. HAR 92-2262, 1993 WL 18951, at *2 (D. Md. Jan. 25, 1993) (same, with respect to Maryland's wage and hour law).

The seaman's exemption, however, muddies the waters. Courts that have considered the specific question of whether the FLSA preempts state laws that do not include the seaman's exemption have reached inconsistent results. The U.S. District Court for the Southern District of Illinois considered the question with respect to the Illinois Minimum Wage Law ("IMWL"), Illinois' equivalent to the FLSA, which – like the MWHL – does not include the seaman's exemption, and concluded that the FLSA preempted the IMWL to the extent that the IMWL applied to seamen on federal waters. *See Coil v. Jack Tanner Towing Co.*, 242 F. Supp. 2d 555, 561 (S.D. Ill. 2002). There, the plaintiffs, who were seamen within the meaning of the FLSA, brought overtime claims under the IMWL. *Id.* at 556. The court, in its preemption analysis, focused not only on federal labor law, but on federal maritime law, stating that "state and federal courts have recognized through well-settled law that it is the intention of the Constitution and Congress for federal law to control *all* maritime law." *Id.* at 558 (citing, inter alia, *Southern Pacific Co. v. Jensen*, 244 U.S. 205 (1917), wherein the United States Supreme Court announced the so-called "*Jensen* doctrine," committing maritime law to the jurisdiction of the federal government, *id.* at 215). Recognizing that state law must "yield to federal maritime law where a state remedy . . . 'interferes with the proper harmony and uniformity'" of existing admiralty law, the court found

that, since "Congress specifically addressed the exemption of seamen from the overtime provisions in the FLSA, . . . application of Illinois['] or any state's differing overtime provisions to seamen on federal waters would destroy the uniformity of rules applicable to commerce on the inland waterways." *Id.* at 559 (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447 (1994)).  This was particularly the case given the role that the plaintiffs played in interstate commerce and that, on a singular trip, they docked across state lines.  *See id.* at 561 ("The distinguishing factors here are the involvement of interstate commerce, the selling and delivery of goods between states, and the varying state presence, Illinois and Missouri, of the Mississippi River channel.").  Thus, the court held that the FLSA preempted the IMWL in this context and precluded the plaintiffs from bringing an overtime claim.  *Id.*  The Superior Court of New Jersey reached the same conclusion in *Flecker v. Statue Cruises, LLC*, wherein the plaintiff, who did not dispute the fact that he was a seaman, brought an overtime claim under the New Jersey Wage and Hour Law ("NJWHL"), which does not exempt seamen from its overtime protections.  *See* 129 A.3d 1129, 1132-34 (N.J. Super. Ct. Law Div. 2013).  In holding that the FLSA preempted the NJWHL, the court, as in *Coil*, found it significant that: 1) the employer's "operations involve[d] interstate commerce over federal waters," because in such circumstances, "federal admiralty law shall apply" *id.* at 1138; and 2) the ships on which the plaintiffs worked traveled between and docked in multiple states, *id.* at 1137-38.

The U.S. Court of Appeals for the Ninth Circuit reached the opposite conclusion in *Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409 (9th Cir. 1990), *cert. denied*, 504 U.S. 979 (1992).  There, the court discussed the *Jensen* doctrine at length and explained that "[t]he Supreme Court long ago rejected a rigid per se rule that all state regulation of maritime activities is constitutionally invalid."  *Id.* at 1421-22.  Accordingly, the court rejected the view that field

preemption was appropriate in matters of maritime and admiralty law and instead concluded that conflict preemption was the correct analysis to apply.  *See id.*  "[T]he general rule on preemption in admiralty is that states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not *actually conflict* with federal law or *interfere* with the *uniform working* of the maritime legal system."  *Id.* at 1422.  Because the maritime employees in *Aubry* were "California residents who work on vessels that operate exclusively off the California coast," and "[u]niformity in maritime law is required 'only where the essential features of an exclusive federal jurisdiction are involved,'" the court held that "application of the state's overtime law w[ould] not disrupt international or interstate commerce."  *Id.* at 1425 (quoting 1 Steven F. Friedell, *Benedict on Admiralty* § 111, at 7-32 (7th ed. 1987)).  In *Fuller v. Golden Age Fisheries*, 14 F.3d 1405 (9th Cir. 1994), the Ninth Circuit applied the same rule, but found that the FLSA did preempt overtime claims under Alaska's minimum wage and overtime statute.  *Id.* at 1409.  In *Fuller*, there were no significant matters of local concern involved because the employees "were engaged in coastwise voyages and their predominant job situs was the high seas rather than the territorial waters of Alaska," and the plaintiffs were not Alaska residents.[7]  *Id.*

In *Tidewater Marine Western, Inc. v. Bradshaw*, 927 P.2d 296 (Cal. 1996), the Supreme Court of California, agreeing with the Ninth Circuit's decision in *Aubry*, held that the FLSA did not preempt California's regulation of seamen's overtime pay.  *Id.* at 301-02.  There, the court focused less on "the fabric of federal admiralty law," *id.* at 301, instead emphasizing that "[i]n determining whether federal law preempts state law, 'our sole task is to ascertain the intent of

---

[7] In distinguishing the case from *Aubry*, the court also emphasized that "key to [the] decision [in *Aubry*] was the fact that the state of California had a 'strong interest in protecting maritime employees that reside in the state and [who] work to protect California's coastal environment' through oil spill clean-up operations."  *Id.* (third alteration in original) (quoting *Aubry*, 918 F.2d at 1426).

Congress,'" *id.* at 302 (quoting *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987)). The court first concluded that field preemption was inapplicable because "not only does the FLSA leave 'room' for supplementary state regulation of overtime," its savings clause "expressly indicates that it does *not* preempt" overtime regulation. *Id.* at 302 (quoting *Guerra*, 479 U.S. at 281). Then, the court concluded that conflict preemption would, too, be inappropriate because "no provision of the FLSA 'actually conflicts' with California law." *Id.* (quoting *Guerra*, 479 U.S. at 281). The legislative history of the FLSA's seaman's exemption "indicates that Congress added the exemption . . . at the request of labor unions representing seamen[, who] were concerned that regulating the employment of seamen under the FLSA would conflict with other federal laws protecting seamen." *Id.* (citing 29 C.F.R. § 783.29); *see also* 29 C.F.R. § 783.29 (describing the legislative history of the seaman's exemption). Thus, the court concluded, "the seamen exemption appears to have had no purpose other than to negate the regulatory effect the FLSA would otherwise have had on the employment of seamen, not to create an affirmative bar against state regulation of that employment." *Tidewater*, 927 P.2d at 302.

The U.S. Court of Appeals for the Fourth Circuit has not directly addressed this issue. However, as the court has acknowledged, "[t]he role of state law in maritime cases is significant and complex." *Wells v. Liddy*, 186 F.3d 505, 524 (4th Cir. 1999). "State law may . . . supplement federal maritime law[;] . . . state law may not, however, conflict with federal maritime law . . . ." *Id.* at 524-25 (first omission in original) (quoting *Powell v. Offshore Navigation, Inc.*, 644 F.2d 1063, 1065 n.5 (5th Cir. 1981)). "State law is said to conflict with general maritime law when it negatively impacts . . . admiralty's foremost goal – uniformity." *Id.* at 525 (citing, inter alia, *Md. Dep't of Nat. Res. v. Kellum*, 51 F.3d 1220, 1227 (4th Cir. 1995)). The Fourth Circuit's rule falls in line with the Ninth Circuit's conflict preemption rule expressed in *Aubry*: that "states may

supplement federal admiralty law as applied to matters of local concern, so long as state law does not *actually conflict* with federal law or *interfere* with the *uniform working* of the maritime legal system." 918 F.2d at 1422; *see also Casino Ventures v. Stewart*, 183 F.3d 307, 310-11 (4th Cir. 1999) (holding that federal law did not preempt South Carolina's restriction on gambling vessels, in part because maritime law is not a field "subject to exclusive federal control").

Reading these cases together, it is apparent that courts must consider three factors when determining whether the FLSA's seamen's exemption preempts more protective state laws. Although, as discussed below, certain overarching considerations – such as congressional intent – remain important, courts must consider, on a case by case basis: 1) the state's interest in applying its law to the plaintiff at issue, *i.e.,* does the plaintiff reside or work in the state; 2) whether the plaintiff's work directly involves interstate commerce; and 3) to what degree does the plaintiff, when working aboard the vessel, travel across state lines.

Here, Maryland's interest in enforcing its overtime provision, including its protection of seamen, falls somewhere between California's interest in *Aubry* and Alaska's interest in *Fuller*. Unlike in *Aubry*, the vessels that Mr. Fisher worked on while underway did not exclusively travel in the territorial waters of Maryland. The two underway trips that Mr. Fisher seeks overtime payment for departed from and returned to ports in California and Wisconsin.[8] *See* ECF No. 25-5, at 110; ECF No. 28, at 3-4; ECF No. 28-11, at 3; ECF No. 31-3, at 8-9. However, unlike the plaintiffs in *Fuller* and *Flecker*, Mr. Fisher is a Maryland resident who worked at a naval base in Maryland, *see* ECF No. 4, at 2, and Maryland has an interest in its residents being paid in accordance with its overtime laws. *See Fuller*, 14 F.3d at 1409 ("Also important is the fact that

---

[8] However, as discussed below, and is relevant to this Court's conclusion, the ships all departed from and returned to the same port.

plaintiffs here were not Alaska residents, unlike the California resident fishermen in *Aubry*");
*Flecker*, 129 A.3d at 1139 ("of the 109 Class Members, fifty-eight are New York residents and
fifty-one are New Jersey residents").

Further, the relative disruption to the uniform application of federal law is comparatively
less when compared with cases in which courts have that the FLSA preempts similar state laws.
In contrast with *Coil* and *Flecker*, Defendant has not established that the trips for which Plaintiff
seeks payment traveled through interstate waters to ports in another state. *See Flecker*, 129 A.3d
at 1139-40 (noting that the vessel traveled to ports in New York and New Jersey which would
create administrative difficulties and thus impede the uniform application of federal maritime law);
*Strain v. West Travel, Inc.*, 70 P.3d 158, 162 (2003) (finding that Washington's minimum wage law
did not apply to an individual who worked on a cruise boat because "[t]he itinerary [plaintiff]
worked, for example, began in Oregon, included stops in Washington and Oregon, and ended in
Portland. Oregon and Washington have differing minimum wage rates."). The information before
the Court only establishes that Plaintiff departed and returned to the same ports in the same state.
*See* ECF No. 28-11, at 3 (stating that the ships on which Plaintiff worked departed and returned to
the same locations); ECF No. 25-5, at 110 (confirming that the ship on which Plaintiff worked
departed from and returned to Wisconsin). Nor, unlike *Coil* and *Flecker*, was Plaintiff involved in
the interstate sale of goods. His responsibilities are most akin to those of the maritime employees
in *Aubry*. Rather than assisting with the transport of goods, as in *Coil*, he performed distinct
maintenance or training tasks unrelated to interstate commerce. *See Coil*, 242 F.Supp.2d at 560
("*Aubry* involve[d] seamen who work[ed] on vessels whose duties involve[d] control and clean[-]
up of oil spills and other environmentally hazardous discharges").

In concluding that the MWHL does not actually conflict with federal law, the Court also considers the legislative history of the seaman's exemption.  Congress added the seaman's exemption as an amendment to the FLSA at the request of seamen's unions, who were satisfied with the preexisting federal regulatory scheme that governed them; there is no indication that Congress sought to exclude seamen from state protections.  *See Aubry*, 918 F.2d at 1418 ("Congress intended to prevent overlapping regulation of wage and hour conditions of seamen by different federal agencies.").  Accordingly, the purpose of the seaman's exemption would not be frustrated by Maryland's enforcement of its overtime compensation requirements.  *See Lagrimas*, 1993 WL 18951, at *2 (finding that the FLSA's domestic worker exemption did not preempt the MWHL to the extent it protects domestic workers' rights to overtime compensation because "the federal purposes and objectives in enacting the exemption would not be affected, let alone frustrated, by Maryland's enforcement of its own overtime compensation requirements").

Finally, because the FLSA's seaman's exemption does not prohibit the payment of overtime wages to seamen, it is not "impossible to comply with both state and federal law" in this case.  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) (explaining that the two circumstances under which conflict preemption applies are where "it is impossible to comply with both state and federal law" and "where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress").  Accordingly, the FLSA does not preempt the MWHL's protection of seamen's overtime rights in this case.

### 2.  Mr. Fisher's Status as a "Seaman" Under the FLSA

Even if the Court were to find that the FLSA's seaman's exception applied to the MWHL, Defendant would not be entitled to summary judgment on the issue because Defendant has not

established as a matter of law that Mr. Fisher is a seaman under the FLSA.[9]  "The determination of whether an employee's activities place that employee within a FLSA exemption is a question of law; the question of what an employee's work activities entail is a question of fact."  *McMahan*, 786 F. Supp. 2d at 1135.  "Whether employees qualify as FLSA-exempt seamen is a fact-sensitive inquiry."  *Id.* (citing, inter alia, *Dole v. Petroleum Treaters, Inc.*, 876 F.2d 518 (5th Cir. 1989), for the proposition that determining whether a worker falls within the seaman exemption "calls for an examination of the nature of the work performed by the employees and of the comparative amount of seamen versus nonseamen duties," *id.* at 522).  While traditionally, courts were to construe the FLSA's exemptions narrowly, *see, e.g.*, *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (stating that "[a]ny exemption from such humanitarian and remedial legislation must . . . be narrowly construed"), the United States Supreme Court has more recently rejected that principle, *see Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88-89 (2018) (rejecting narrow interpretation "as a useful guidepost for interpreting the FLSA" and opining that "[b]ecause the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, 'there is no reason to give [them] anything other than a fair (rather than a "narrow") interpretation'" (alteration in original) (quoting Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 363 (1st ed. 2012))).  The employer bears the burden of proving by clear and convincing evidence that

---

[9] While Mr. Fisher was "underway" for a small portion of his employment with BAE Systems, three trips during his approximately 2.5 years of employment with BAE Systems, *see* ECF No. 25-5, at 51-52 (Mr. Fisher's testimony that he had done three trips underway); ECF No. 25-3, at 2; ECF No. 28, at 2 (Mr. Fisher's employment began in August 2019); ECF No. 28-2, at 6 (BAE Systems terminated Mr. Fisher on November 22, 2022), the FLSA's exemptions are applied on a week-by-week basis, 29 C.F.R. § 780.10 ("The workweek is the unit of time to be taken as the standard in determining the applicability of an exemption. . . . An employee may thus be exempt in 1 workweek and not in the next."); *see also Sternberg Dredging Co. v. Walling*, 158 F.2d 678, 678-79 (8th Cir. 1946) (analyzing the seaman's exemption based on the employee's work during a given workweek).  Accordingly, in determining whether he was a seamen, the Court at the specific work he performed during each week he was underway.

its employee falls within the exemption. *McMahan*, 786 F. Supp. 2d at 1135; *Craighead v. Full Citizenship of Md., Inc.*, No. 17-cv-595-PX, 2020 WL 5653224, at *4 (D. Md. Sept. 23, 2020). Thus, for Defendant to prevail on its Motion for Summary Judgment, it must show that "no rational jury, properly instructed, could fail to conclude that" Mr. Fisher "fell within the scope of the 'seaman' exemption." *McLaughlin v. Harbor Cruises LLC*, 880 F. Supp. 2d 179, 181 (D. Mass. 2012).

The Department of Labor's regulations advise that:

> [A]n employee will ordinarily be regarded as 'employed as a seaman' if he performs, . . . subject to the authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character.

29 C.F.R. § 783.31. The regulations further provide that "members of the crew such as sailors, engineers, radio operators, firemen, pursers, surgeons, cooks, and stewards" are "seamen," and specify that "an employee employed as a seaman does not lose his status as such simply because, as an incident to such employment, he performs some work not connected with operation of the vessel as a means of transportation . . . if the amount of such work is not substantial." *Id.* § 783.32. Work of a different character "is 'substantial' if it occupies more than 20 percent of the time worked by the employee during the workweek." *Id.* § 783.37. Ultimately, whether an employee is employed as a seaman "depends upon the character of the work he actually performs and not on what it is called or the place where it is performed." *Id.* § 783.33. "Merely because one works aboard a vessel . . . one is not employed as a seaman within the meaning of the Act unless" the employee's services fit into the work described in § 783.31. *Id.* § 783.33.

Courts generally interpret the Department of Labor's regulations as creating a two-part inquiry to determine if an employee is a seaman within the meaning of the FLSA. *See, e.g.*, *Halle*

*v. Galliano Marine Serv., L.L.C.*, 855 F.3d 290, 293 (5th Cir. 2017).  "An employee is a seaman when the following criteria are met: '(1) the employee is subject to the authority, direction, and control of the master; and (2) the employee's service is primarily offered to aid the vessel as a means of transportation . . . .'"  *Id.* (quoting *Coffin v. Blessey Marine Servs., Inc.*, 771 F.3d 276, 281 (5th Cir. 2014)).  Mr. Fisher testified that while he was working on underway assignments, he was under the direction of the ship's captain.  ECF No. 25-5, at 10.  Thus, whether Mr. Fisher is properly classified as a seaman turns on whether his work testing, maintaining, and repairing onboard IFF systems and training the vessel's staff on the use of IFF systems was service that aided the vessel as a means of transportation.

The types of activities courts have held to be of the sort that aid vessels as means of transportation include "handl[ing] the vessel's lines and gangway, participat[ing] in mooring the vessel, assist[ing] passengers to embark and disembark, . . . keep[ing] watch as needed, occasionally reliev[ing] the captain at the wheel, perform[ing] safety inspections and drills, conduct[ing] engine and bilge checks and perform[ing] repairs as necessary, [and] observ[ing] security precautions."  *McLaughlin*, 880 F. Supp. 2d at 186.  Additionally, activities such as "keeping [the vessel] afloat and clean, scraping the barnacles off its hull, keeping the engines in repair, [and] preventing fires" also qualify as duties that aid the vessel as a means of transportation because they are necessary for a vessel's "safe and efficient operation and maintenance."  *Harkins v. Riverboat Servs., Inc.*, 385 F.3d 1099, 1104 (7th Cir. 2004).  "And of course, 'checking . . . fluids on each shift, visually inspecting the vessel for damage, . . . [and] keeping the logbooks' all qualify."  *Curran v. Wepfer Marine Servs., Inc.*, No. 1:20-cv-01229-STA-jay, 2023 WL 1790075, at *4 (W.D. Tenn. Jan. 9, 2023) (alteration and omissions in original) (quoting *Godard v. Ala. Pilot,*

*Inc.*, 485 F. Supp. 2d 1284, 1300 (S.D. Ala. 2007)), *report and recommendation adopted*, No. 1:20-cv-1229-STA-jay, 2023 WL 1787179 (W.D. Tenn. Feb. 6, 2023).

Generally, where a worker is on board a vessel "only so they can be transported to the place where they will do their primary work," the worker is not serving "'as an aid to the operation of such vessel as a means of transportation,' and thus [is] not within the exemption." *McLaughlin*, 880 F. Supp. 2d at 183 (quoting 29 C.F.R. § 783.31); *see id.* at 183 nn.6-8 (collecting cases). This principle has been applied, for example, to employees whose primary work is dredging, *see, e.g.*, *Walling v. W.D. Haden Co.*, 153 F.2d 196, 199 (5th Cir. 1946) (holding that employees in the clamshell dredging industry were not exempt because their "dominant employment [was] clearly the industrial one, the production of shells," and "[t]he maritime work [was] incidental and occasional"); *Sternberg Dredging Co. v. Walling*, 158 F.2d 678, 681 (8th Cir. 1946) (same), conducting scientific studies aboard ships, *Donovan v. Nekton, Inc.*, 703 F.2d 1148, 1150, 1151-52 (9th Cir. 1983) (per curiam) (holding that marine and electronic technicians were not "seamen" because, as "part of the ship's scientific team" their purpose was aiding in the performance of seismic surveys, not the operation of the vessel as a means of transportation), and servicing offshore oil wells, *Dole*, 876 F.2d at 524 (holding that workers who "spent at least half of their time maintaining and servicing . . . oil wells, a 'nonseamen' duty," were not employed as seamen). Additionally, courts have drawn a distinction between "*prepar[ing]* [a] vessel for navigation" and "actual *operation* as a means of transportation." *Owens v. SeaRiver Mar., Inc.*, 272 F.3d 698, 704 (5th Cir. 2001) (holding that work loading and unloading a cargo ship was not seaman's work).

Mr. Fisher's job duties are most analogous to the duties of the plaintiff in *Halle v. Galliano Marine Service, L.L.C.*, 855 F.3d 290 (5th Cir. 2017), who worked as a remotely operated vehicle ("ROV") technician aboard a support vessel. *Id.* at 292. An ROV is an "unoccupied mechanical

device[] used, among other things, to fix, service, and repair offshore, underwater drilling rigs." *Id.* ROV technicians "navigate and control ROVs aboard an ROV Support Vessel, to which the ROVs remain tethered while in use." *Id.* The plaintiff in *Halle* brought an FLSA overtime claim, and the defendant moved for summary judgment, arguing that the plaintiff was a seaman and accordingly exempt from the FLSA's overtime protections. *Id.* at 293. The district court found for the defendant, holding that the plaintiff was a seaman because the ROVs were "critical to the [support] vessel's navigation, operation[,] and mission," despite the fact that the plaintiff's work did not itself involve navigation of the vessel. *Halle v. Galliano Marine Serv., LLC*, No. 15-5648, 2016 WL 740440, at *4 (E.D. La. Feb. 25, 2016), *rev'd*, 855 F.3d 290. The U.S. Court of Appeals for the Fifth Circuit reversed, holding that the defendant had not established as a matter of law that the seaman's exemption was applicable.[10] *Halle*, 855 F.3d at 296. The court found that although the plaintiff lived aboard the support vessel, he did so "to complete industrial tasks" separate and apart from "ensur[ing] that the support vessel navigate[d] safely or even in any particular manner from point A to point B." *Id.* at 295. The court declined to "equate maintenance, repair, or navigation of superficially attached machinery . . . with maintenance, repair, or navigation of the support vessel." *Id.* The plaintiff's work primarily supported underwater drilling operations, not the vessel as a means of transportation. *See id.* at 296.

Mr. Fisher agreed in his deposition that his work on IFF systems "assisted in the maintenance of the ship." ECF No. 25-5, at 9. However, Defendant has not established that, as a matter of law, this work aided vessels for the purposes of transportation. First, based on the

---

[10] The Court noted in its decision that there was conflicting evidence as to whether the plaintiff "report[ed] to the support vessel's captain," and thus summary judgment was also inappropriate based on the first prong of the test, but stated that its finding on the second prong, whether the plaintiff's work supported the vessel as a means of transportation, was "dispositive" and the focus of its analysis. *Halle*, 855 F.3d at 294.

information presently before the Court, IFF technology is primarily used on military vessels to collect information to determine whether other air and water vessels are hostile or friendly. Other vessels send out signals which the IFF systems capture to ascertain whether the vessel is a threat. Thus, like the plaintiff's work in *Halle*, which the court found was principally geared toward underwater drilling rather than transportation, a reasonable jury could find that Mr. Fisher's work primarily supported the collection of data by the boat's military equipment, rather than the boat's transportation. *See Harkins*, 385 F.3d at 1104 (explaining that the relevant question was whether "the plaintiffs spend their time performing duties that are necessary to the operation of the [vessel] because it is a ship or because it is a casino," and that "[i]t was for the jury to decide whether the . . . plaintiffs . . . were more like the helmsman [or] like the blackjack dealer")

Second, Mr. Fisher worked underway only to be transported to a location where he did his primary work: testing IFF systems. Certain testing and repairs on IFF systems can only be completed while the ship is underway because the IFF system must capture information from other vessels out at sea. *See* ECF No. 25-5, at 9. Accordingly, Mr. Fisher is akin to the scientists in *Donovan v. Nekton, Inc.*, 703 F.2d 1148 (9th Cir. 1983) (per curiam), who traveled out to sea because they could only collect their data out at sea. *See id.* at 1150, 1151-52. In both cases, the ships transported the employees to a place where they could complete their work rather than the employee's work contributing to the ship as a means of transportation.

Finally, part of Mr. Fisher's work while underway was training the ships' crews on use of the IFF systems, presumably so that the crew and ship could operate without an IFF technician on board. Courts have considered whether the boat can operate as a means of transportation without the employee at issue and have found that if, without the employee, the "boat cannot serve as a means of transportation at all," the employee is a seaman. *Godard*, 485 F. Supp. 2d at 1298. Here,

part of Mr. Fisher's underway work was directed toward ensuring that the vessels could, and did, operate without him.  Given these weaknesses in Defendant's argument, Defendant has not met its burden to establish as a matter of law that Mr. Fisher is a seaman within the meaning of the FLSA.

### C.  Identification of Compensable Time

Finally, Defendant argues that Mr. Fisher's overtime claims should be dismissed because he has not identified any compensable time that he worked during the underway trips for which BAE Systems failed to compensate him.  *See* ECF No. 25-2, at 18-20.  The plaintiff bears the burden of proof of an overtime claim under the MWHL.  *See Randolph*, 309 F.R.D. at 362 ("Plaintiff carries the burden of proof in an FLSA claim for overtime wages."); *Craighead*, 2020 WL 5653224, at *4 (explaining that the FLSA and MWHL "adopt the same overtime standards").  The "burden is light," but "[t]he employee must produce 'sufficient evidence to show the amount and extent of . . . work as a matter of just and reasonable inference.'"  *Randolph*, 309 F.R.D. at 363 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).

In his answers to interrogatories, Mr. Fisher verified that he worked overtime on underway trips in November and December of 2020 and that BAE Systems did not properly pay him for this time.[11]  ECF No. 28-11, at 2.  During the November 2020 underway trip, Mr. Fisher was on board the vessel for twenty-six hours.  *Id.*  Mr. Fisher claims that he should have been paid for 24.5 hours of work for that trip, including all time on board the ship minus three thirty-minute meal periods.  *Id.*  This includes time that Mr. Fisher was sleeping.  *See* ECF No. 25-5, at 113.  During his December 2020 underway trip, Mr. Fisher was on board the vessel for sixteen hours.  ECF No. 28-

---

[11] Mr. Fisher's Answers to Interrogatories initially included a third underway trip in August 2021 for which he alleged that he worked overtime hours for which BAE Systems did not compensate him.  ECF No. 28-11, at 2.  He later amended his answers to exclude the August 2021 trip.  ECF No. 25-6, at 107-08.

11, at 2.  Mr. Fisher claims that he should have been paid for fifteen hours of work, which includes all hours that he was on board minus two thirty-minute meal periods.  *Id.*  Mr. Fisher does not present any further evidence about exactly what work he did during the underway trips or how much of the on-board time he actually spent performing work.  *See* ECF No. 25-5, at 60 (Mr. Fisher testifying that he did not keep a log of the work he did while underway and did not keep track of the work schedule while underway, including the times he would have stopped performing work); ECF No. 28, at 27-29 (Mr. Fisher's brief in opposition to Defendant's Motion for Summary Judgment, which does not identify any evidence in the record of the amount of time that he was physically performing work during his underway assignments).  Rather, Mr. Fisher argues that because of the nature of his employment, he was entitled to payment for all the hours he spent aboard the ships during his underway assignments.  *See* ECF No. 28, at 27.

Neither the MWHL nor the FLSA defines the term "work" or "compensable work" for purposes of calculating the amount of time an employee worked to determine whether the employee is entitled to overtime pay.  *Amaya v. DGS Constr.. LLC*, 278 A.3d 1216, 1233, 1246 (Md. 2022).  The Code of Maryland Regulations ("COMAR") defines "hours of work" as "the time during a workweek that an individual employed by an employer is required by the employer to be on the employer's premises, on duty, or at a prescribed workplace."  Md. Code Regs. 09.12.41.10(A).  Courts make a "familiar distinction between being 'engaged to be waiting', which is compensable, and 'waiting to be engaged', which is not."  *Marroquin v. Canales*, 505 F. Supp. 2d 283, 295 (D. Md. 2007) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944)).  While this distinction comes from the body of caselaw interpreting the FLSA, this Court has applied the concept to overtime claims brought under the MWHL.  *See id.* (recognizing that Maryland law regarding "on duty" or "on call" time is undeveloped and denying the plaintiffs' motion for

41

summary judgment on their MWHL claim because there was a question of fact as to whether the plaintiff employees were engaged to be waiting or waiting to be engaged); *Clayton v. Delmarva Cmty. Servs., Inc.*, 447 F. Supp. 3d 404, 418-19 (D. Md. 2020) (stating that "where a Maryland appellate court has not addressed an issue, to the extent that a state analogue is analogous to a federal statute, the decisions of federal courts are highly persuasive authority" and granting summary judgment in the defendant's favor because the plaintiffs made MWHL claims for time they spent "waiting to be engaged").

Whether an employee in an "on call" situation is "engaged to be waiting" or "waiting to be engaged" generally depends on the degree of the restrictions placed on the employee. *See Clayton*, 447 F. Supp. 3d at 414. Where the restrictions are so significant that the employee cannot use the time effectively for personal pursuits, the employee's "time is spent predominantly for the employer's benefit," *id.* (quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)), and the employee is "engaged to be waiting," *id.* By contrast, where the employee "may actually engage in personal activities during on call shifts," *id.* (quoting *Whitten v. City of Easley*, 62 F. App'x 477, 480 (4th Cir. 2003) (per curiam)), they are "waiting to be engaged," *id.* The Fourth Circuit has set out four factors for courts to weigh when deciding the level of interference with an employee's private life:

> (1) whether the employee may carry a beeper or leave home; (2) the frequency of calls and the nature of the employer's demands; (3) the employee's ability to maintain a flexible 'on call' schedule and switch 'on call' shifts; and (4) whether the employee actually engaged in personal activities during 'on call' time.

*Whitten*, 62 F. App'x at 479. The issue of whether an employee was engaged to be waiting or merely waiting to be engaged "may be answered as a matter of law, or if the facts are unclear, may be answered at trial." *Clayton*, 447 F. Supp. 2d at 414 (internal citation omitted).

Mr. Fisher essentially argues, without citing to any facts from the record, that during his underway trips he was "engaged to be waiting," and thus entitled to overtime compensation for all hours on board the ships.  ECF No. 28, at 27.  Though Mr. Fisher does not explicitly argue why his underway work is properly classified as "engaged to be waiting," *see id.* at 27-29, the Court assumes that Mr. Fisher bases this assertion on the fact that he was unable to leave the boats while underway and thus his freedom was severely restricted.  The weight of authority, however, suggests that an employee's inability to leave the premises of their work does not necessarily mean the employee is engaged to be waiting.  In *Clayton v. Delmarva Community Services, Inc.*, 447 F. Supp. 3d 404 (D. Md. 2020), for example, this Court found that employees at an independent living residential facility who were required to remain on the premises at night were waiting to engage. *See id.* at 407, 414.  There, the employees "clocked out at night" and "either slept, watched television, read, or engaged in other personal activities."  *Id.* at 414.  If the employees were ever awakened by a resident during the night, which happened "only infrequently," *id.* at 415, they were instructed to clock in "in order to be paid for the time spent working," *id.* at 414.  This Court found that despite the fact the employees remained on the premises overnight, the time was not compensable under the FLSA or the MWHL.  *See id.* at 414-15, 418-19.  The Court explained that "the relevant inquiry is not whether [the] [p]laintiffs had the freedom to leave, but whether they had the freedom to engage in personal activities."  *Id.* at 414.  This Court and the Fourth Circuit have, on multiple occasions, similarly held that employees were waiting to engage even where they were unable to leave their place of employment.  *See, e.g.*, *Watkins v. United Needs & Abilities, Inc.*, No. RDB-20-0681, 2021 WL 2915265, at *7, *10 (D. Md. July 12, 2021) (granting summary judgment on the plaintiff's FLSA and MWHL overtime claims because he was waiting to be engaged, even where his employer required him to remain on the premises overnight); *Myers*

*v. Baltimore County*, 50 F. App'x 583, 587-88 (4th Cir. 2002) (affirming the district court's conclusion that the plaintiffs were "'waiting to be engaged' as a matter of law," even where the plaintiffs were required to remain on the premises).

Mr. Fisher bears the burden of showing that the hours for which he seeks overtime payment were compensable work hours, or, more specifically, that he was "engaged to be waiting" during those hours.  Mr. Fisher has not presented "sufficient evidence to show the amount and extent of . . . work" he did while underway.  *Randolph*, 309 F.R.D. at 363 (quoting *Anderson*, 328 U.S. at 687); *see Myers*, 50 F. App'x at 587-88 (affirming summary judgment where there was "no indication that interruptions of private pursuits were frequent enough to render such time work time").  On the contrary, he testified that there was often significant downtime on underway assignments, ECF No. 25-5, at 109, and he slept on one of the underway assignments, *id.* at 113.  Accordingly, summary judgment is appropriate on Mr. Fisher's overtime claim under the MWHL.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED with respect to Counts II, III, and IV, and DENIED with respect to Count I.

So ordered.

Date: July 17, 2024

_____/s/_____
Ajmel A. Qureshi
U.S. Magistrate Judge